**In re Hallie Elizabeth BURGER,
Debtor.**

No. 98–15274.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Feb. 14, 2000.

Eric W. Goering, Cincinnati, OH, for debtor.

Steven R. Fansler, West Liberty, OH, trustee.

### *MEMORANDUM*

JEFFERY P. HOPKINS, Bankruptcy Judge.

This matter is before the Court on opposing motions. An Amended Motion to Dismiss Chapter 12 Case ("Motion to Dismiss") (Doc. 21) was filed on October 29, 1998, by James and Ethel Sloan. By their Motion to Dismiss, the Sloans seek to have this chapter 12 case dismissed pursuant to 11 U.S.C. § 1208(c). The Debtor, Hallie Elizabeth Burger, filed a Motion to Convert Chapter 12 to Chapter 13 ("Motion to Convert") (Doc. 22) on November 5, 1998. An evidentiary hearing on both motions was held on December 10, 1998.

The Debtor commenced this case, pro se, with the filing of a skeleton petition under chapter 12 on August 31, 1998. The Sloans argue that this case should be dismissed for one or more of the following reasons: (1) the Debtor filed the instant case while she had another case pending in Florida; (2) the Debtor did not file her schedules in a timely manner; (3) the Debtor failed to appear at her meeting of

creditors; (4) the Debtor does not qualify as a debtor under chapter 12; and (5) the Debtor filed her petition in bad faith. The Debtor, conceding that she does not qualify as a debtor under chapter 12, argues that dismissal is not appropriate and the Court should permit the case to be converted to chapter 13.

## I

The Debtor, her mother and her aunt have each played a role in a certain horse farming enterprise located in the state of Florida. The record, however, is unclear as to the legal form of this operation. Originally, the Debtor was not a party to the business. The mother was the principal operator of the business, conducting its daily affairs at a facility known as Burger Arabian Training Center. The aunt's role appears to have been limited primarily to that of a silent investor, stepping in to provide funds whenever necessary. An unknown third party was involved at some point but backed out on the mother and the aunt. In 1988, the Debtor entered the picture by providing funds that she received as an inheritance from her grandmother. The transfer was originally deemed to be a loan of approximately $350,000.00. At some point, the mother was involved in a divorce and thereafter named the horse farming enterprise Three Fillies Farm, referring to the mother, the aunt and the Debtor. The mother and the aunt continued in their roles while the Debtor was assigned the role of occasionally traveling from Ohio to Florida to assist her mother in the daily operations. The Debtor testified that her mother, later realizing that she would not be able to repay the $350,000.00 formerly advanced by the Debtor, executed a bill of sale in 1993 conveying certain Arabian horses to the Debtor as consideration for the funds advanced.[1] In 1996, the mother changed facilities and began renting a farm from the

Sloans. Although the record is unclear, someone became indebted to the Sloans, either a business entity operated by the three women or one or more of them in an individual capacity. As a result, the horses were scheduled to be sold at a sheriff's sale. That sale and many others did not occur, however, because of the mother's filing of multiple bankruptcy petitions. In late June or early July of 1998, the Debtor learned that another sale of the horses was scheduled. The Debtor, to no avail, attempted to negotiate with Mr. Sloan. Thereafter, the Debtor, acting pro se, filed a chapter 13 petition in Tampa, Florida on July 30, 1998, which she admits was for the sole purpose of protecting her assets. Specifically, the Debtor testified that bankruptcy was the only method that she could think of to have a stay placed upon the sheriff's sale of the horses.

Although the Debtor filed the Florida case pro se, she did have some help. She obtained the assistance of a petition preparer that was recommended to her by her mother. Initially, the Debtor filed only a skeleton petition and a one page, handwritten attachment entitled "Creditor List." The only creditor listed on the "creditor list" was the Sloans. When asked who prepared the "creditor list," the Debtor testified that she thought it was her mother's handwriting. The Debtor filed her schedules in the Florida case on August 18, 1998. On her schedules, she listed one secured creditor with a claim of $5,910.00 secured by a 1992 Ford Ranger and one unsecured creditor, the Sloans, with a claim of $25,500.00. The Debtor characterized the Sloan claim as disputed. Notwithstanding the Debtor's Florida bankruptcy, the Sloans elected to proceed with the sale of the horses. At this point, the Debtor deemed it necessary to obtain an attorney. The Debtor retained the services of Florida counsel, Harvey Paul Muslin. Interestingly, the Debtor found Mr.

---

1. Although counsel for the Debtor assured the Court that he was in possession of the bill of sale, it was never offered into evidence.

Muslin through her mother and Mr. Muslin was paid by the Debtor's mother with funds provided by the Debtor's aunt. On August 25, 1998, the Debtor, through counsel, filed: (1) an emergency motion for sanctions against the Sloans for an alleged violation of the automatic stay in rescheduling the sheriff's sale; and (2) an emergency motion for turnover of property of the estate. Two days later, on August 27, 1998, the Debtor, through counsel, filed withdrawals of both motions, representing that after due diligence it had been determined that there was insufficient cause for the motions. On September 1, 1998, Mr. Muslin filed a motion to withdraw as counsel for the Debtor, citing irreconcilable differences with the Debtor. On September 4, 1998, the Debtor, through counsel, filed a notice of voluntary dismissal of her chapter 13 case in Florida. An order dismissing the case was entered by the Florida bankruptcy court on September 11, 1998.

The Debtor testified that she never authorized Mr. Muslin to withdraw the emergency motions. Similarly, she testified that she never saw the notice of dismissal before it was filed. In essence, the Debtor made it clear that she did not approve of the actions taken by Mr. Muslin in this regard. However, the Debtor later appeared to contradict herself when she testified that Mr. Muslin advised her that her case should be administered in Ohio instead of Florida. The Debtor provided two versions of this apparent contradiction. On the one hand, the Debtor said that she and Mr. Muslin had an agreement, pursuant to a long distance telephone conversation between Ohio and Florida, whereby Mr. Muslin was to give the Debtor thirty minutes to file a new petition in Ohio while the Florida case was still pending and then Mr. Muslin would dismiss the Florida case. On the other hand, the Debtor stated that Mr. Muslin told her that she needed to transfer the case to Ohio and convert. In this respect, the Debtor testified that she thought her Florida case had been transferred instead of dismissed, even though she proceeded to file a new petition in this Court.

Regardless of how it came to pass, the record is clear that the Debtor, again acting pro se with the assistance of the petition preparer recommended by her mother, filed a skeleton chapter 12 petition in this Court on August 31, 1998, while her chapter 13 case in Florida was still pending. Contemporaneously, the Debtor filed with this Court: (1) another emergency motion for sanctions for an alleged stay violation by the Sloans; and (2) another emergency motion for turnover of property of the estate. Although acting pro se, the Debtor said that she drafted the motions with the assistance of the petition preparer. The Debtor obtained an extension of the deadline for filing her schedules to October 2, 1998, and a meeting of creditors was scheduled for September 30, 1998. Also scheduled for September 30, 1998, was a hearing on the Debtor's emergency motions. The Debtor failed to appear at the meeting of creditors. However, she did appear at the hearing on the emergency motions, with the benefit of local counsel that she obtained only hours earlier. At the hearing, the Debtor presented no evidence and her attorney acknowledged that the Debtor is not eligible for relief under chapter 12. At the conclusion of the hearing, the Court stated that the emergency motions would be denied for failure of the Debtor to satisfy her burden of proof. An order to this effect was entered on October 8, 1998. The Debtor did not file her Schedules and her Statement of Financial Affairs until December 7, 1998.

The Debtor scheduled one secured creditor in this case which is the same secured creditor scheduled in the Florida case. However, unlike her Florida case, the Debtor scheduled seven other unsecured creditors in addition to the Sloans. Schedule D reflects that four of the eight unsecured debts are somewhat older, having been incurred in 1995. When asked if she

was currently being billed by certain of these creditors, the Debtor admitted that she was not. The Debtor testified that certain of the unsecured creditors listed on Schedule D were listed simply because they showed up on a credit report that she obtained to assist her with her filing. With respect to the four current unsecured creditors, the Debtor admitted that two of the four had never sent her a bill. Specifically, the Sloans and a Florida veterinarian have never requested any payment from her. The Debtor stated that she included the veterinarian on her schedules for the sole purpose of maintaining good rapport so that the vet would not discontinue services to the Florida horse farm. As to the Sloans, the Debtor scheduled them as a disputed creditor. The other current unsecured creditors who apparently do seek repayment from the Debtor include the Florida petition preparer and a long distance telephone carrier, the latter debt arising from all of the phone calls that the Debtor made to Florida to coordinate her bankruptcy filings.

## II

Although the Sloans have raised a number of persuasive arguments for dismissal, the Court deems it necessary to examine only the allegation of a bad faith filing. Section 1208(c), governing involuntary dismissal of chapter 12 cases, provides that a case may be dismissed for "cause." Evidence of a bad faith filing constitutes cause for dismissal pursuant to § 1208(c). *See e.g., In re Hyman,* 82 B.R. 23 (Bankr.D.S.C.1987); *In re Galloway Farms, Inc.,* 82 B.R. 486 (Bankr.S.D.Iowa 1987). Analogously, many courts, including this one, have concluded that a bad faith filing constitutes cause for dismissal of a chapter 13 case pursuant to 11 U.S.C. § 1307(c). *See In re Butt,* No. 97–17695, 1999 WL 1038241, at *5 (Bankr.S.D.Ohio Sept. 30, 1999) (Hopkins, J.). To determine whether a chapter 12 petition has been filed in bad faith, courts often look to the same factors analyzed in the chapter 13 context. *In re Massie,* 231 B.R. 249,

252 (Bankr.E.D.Va.1999). In *Butt,* this Court concluded that "[t]he ultimate inquiry behind this judicially created ground for dismissal is whether the debtor has abused the bankruptcy process." *Butt,* 1999 WL 1038241 at *5. In the instant case, the Court believes that the Debtor has abused the process intended by Congress. This conclusion is supported by the findings of the *Massie* court.

Ironically, the facts of *Massie* bear a striking resemblance to the facts of this case. The debtor's mother, Ms. Harrelson, owned a horse farm known as Briary Farm. Ms. Harrelson had been in bankruptcy since 1994. William P. Bock ("Mr. Bock") obtained relief from the automatic stay in the Harrelson case to foreclose on Briary Farm. Mr. Bock eventually purchased the farm at the foreclosure sale. Notwithstanding, the debtor and her mother refused to vacate the premises. Mr. Bock filed an unlawful detainer action in state court and obtained a writ of possession. Ms. Harrelson appealed the decision. Hours before the appeal was to be heard, the Debtor, acting pro se, filed a chapter 12 petition to thwart Mr. Bock's possession of Briary Farm. The chapter 12 trustee filed a motion to dismiss the debtor's case on the ground that she did not qualify as a chapter 12 debtor because she was not a family farmer as the term is defined by the Code. Mr. Bock filed a motion to convert the case to chapter 7 based upon allegations of fraudulent misrepresentation arising from omissions in the debtor's schedules. The debtor responded by filing a motion for voluntary dismissal.

Although the court did not find the debtor's testimony to be credible, Mr. Bock failed to prove that the debtor knowingly misrepresented her assets with an intent to deceive. More importantly, the court did find dismissal to be proper based upon its conclusion that the debtor filed her bankruptcy petition in bad faith. Similar to this Court, the *Massie* court deemed it

necessary to examine the debtor's motivations in filing her chapter 12 petition to determine whether she filed in a manner that was abusive to the bankruptcy process. The court concluded that the chapter 12 filing was abusive where: (1) the debtor admitted that her sole purpose in filing was to stop Mr. Bock's action for possession of Briary Farm; (2) the debtor's schedules established that she had minimal debt other than the outstanding dispute with Mr. Bock; (3) the debtor filed a hastily prepared petition that failed to comply with filing deadlines regarding her schedules; and (4) the debtor admitted that she did not qualify as a debtor under chapter 12. The court summarized as follows:

> [The debtor's] financial condition is, in essence, a two-party dispute between her mother and Bock. Objectively, reorganization would be futile, as debtor has nothing to reorganize.

*Massie*, 231 B.R. at 253 (emphasis added).

### III

■ This Court concludes that all of the facts in *Massie* evidencing a bad faith filing are present in this case, plus additional indicia of bad faith. Similar to *Massie:* (1) the Debtor admitted that she filed for bankruptcy for the exclusive purpose of staying the sale of the horses because she couldn't think of any other way to prevent the sale; (2) the Debtor's schedules and her testimony regarding the same reflect that she has minimal debt and need for reorganization; (3) the Debtor hastily filed a skeleton petition on the eve of the sale of the horses and failed to file her schedules and Statement of Financial Affairs for more than two months following the respective deadline, which itself was an extension of the original deadline; and (4) the Debtor has admitted that she does not qualify as a debtor under chapter 12.

With regard to the second factor listed above, the Court finds this case to be more egregious than *Massie*. Two of the Debtor's alleged creditors, the Sloans and the veterinarian, have never sought payment from the Debtor. Instead, they appear to be creditors of the horse farming operation or the mother and/or the aunt in their individual capacity. The alleged Sloan debt is of particular concern to the Court. The Debtor has no problem utilizing the benefit of the bankruptcy stay when it comes to precluding the Sloans from pursuing their state law remedies with respect to the horses. Yet, the Debtor is unwilling to administer the alleged claim in her bankruptcy case, disputing the claim. If the Debtor is correct that the Sloans do not have a claim against her, this fact would only further support the theory that the Debtor is simply using the Bankruptcy Code and its automatic stay for nothing more than an injunction that she could not or did not obtain elsewhere. If the Debtor is incorrect about the validity of the claim, this fact would only further support the theory that the Debtor is more than happy to benefit from the protections that the Bankruptcy Code provides to honest debtors while balking at other aspects of the process that appear distasteful to her.[2]

In addition to the *Massie* factors, there exist other factors indicative of the Debtor's bad faith. First, it has yet to be established whether the Debtor even owns the horses so that her bankruptcy filing would affect the Sloans' pursuit of their state law remedies against the horses. The Debtor has gone out of her way to let the Sloans know that she believes that any action against the horses is stayed by her bankruptcy filing because the horses are property of her bankruptcy estate. Nevertheless, the Debtor has twice declined in this Court to offer into evidence the alleged bill of sale transferring the horses to

---

**2.** As further evidence of the Debtor's need for reorganization, the record is clear that the majority of her eight unsecured creditors are not currently seeking, and have not recently sought, payment from her. The only two that

appear to seek repayment are creditors that would not be creditors but for the bankruptcies—the petition preparer and the long distance phone bill related primarily to the coordination of the bankruptcies.

her. The Debtor's first opportunity arose at the emergency hearing on the turnover and stay violation motions. Ownership of the horses was a critical element to the Debtor's success under both of these motions, yet she failed to offer any evidence of the same. The Debtor's second opportunity arose at the hearing on the instant dismissal and conversion motions. The Debtor's ownership of the horses, or lack thereof, is certainly indicative of a bad faith filing. If the Debtor filed her chapter 12 petition for the primary purpose of staying the sale of the horses when she doesn't even own them, such circumstances would certainly constitute a bad faith filing.

Other indicia of bad faith include the fact that the Debtor, in addition to her failure to comply with the deadline for filing her Schedules and Statement of Financial Affairs, failed to appear at her meeting of creditors. Again, this evidences the acceptance of the benefits of bankruptcy while rejecting the consequences. Further, the Debtor filed the instant chapter 12 petition while her chapter 13 case was still pending in Florida. Although the Court elects not to rule on the propriety of such action, there exists a split in the case law as to the validity of the subsequent case. Finally, the record contains evidence of abusive collusion on the part of the debtor, her mother and her aunt that violates the intended spirit of the Bankruptcy Code. Although it is unclear exactly how many bankruptcies the mother filed and their timing in relation to the collection efforts of the Sloans, the Debtor admitted that her mother filed multiple bankruptcies and the Debtor thought that the horses were protected by her mother's filings. In the summer of 1998, the Debtor apparently concluded that the horses were not protected any longer. Accordingly, she filed for bankruptcy for the sole purpose of preventing the sale of the horses. The petition preparer that the Debtor hired to assist with her filing was recommended by her mother. Further, the "creditor list" attached to the skeleton petition filed in Florida, according to the Debtor's testimony, was handwritten by her mother and listed only the Sloans, their address and an apparent objection to the Sloan debt. When the Debtor realized that the Florida bankruptcy did not deter the Sloans' plans to sell the horses, the Debtor's mother located an attorney and paid him with funds provided by the Debtor's aunt.

After considering all of the evidence in this case, the Court is of the opinion that the Debtor has used the bankruptcy system for purposes that it was not intended for. Similar to *Massie,* where the court concluded that it was essentially confronted with "a two-party dispute between [the debtor's] mother and Bock," *Massie,* 231 B.R. at 253, this Court concludes that the instant case is nothing more than a two-party dispute between the Debtor's mother, either individually or as a participant in some undetermined business entity, and the Sloans. The Debtor merely used the system for unintended purposes as a last resort when the mother had exhausted all options available to her. The Supreme Court has long noted that the Bankruptcy Code, and its predecessor-the Bankruptcy Act, is available only to the "honest but unfortunate debtor." *See Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Hallie Elizabeth Burger and her actions related to this bankruptcy case do not fall within this definition.

### IV

For the foregoing reasons, the Amended Motion to Dismiss Chapter 12 Case filed on October 29, 1998, by James and Ethel Sloan will be **GRANTED**. The Motion to Convert Chapter 12 to Chapter 13 filed by the Debtor, Hallie Elizabeth Burger, on November 5, 1998, will be **DENIED**. An order to this effect will be entered.